# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

U.S. BANK, NATIONAL ASSOCIATION, AS
TRUSTEE FOR THE CERTIFICATEHOLDERS
OF BEAR STEARNS ASSET-BACKED
SECURITIES TRUST 2006-AC5, ASSET-
BACKED CERTIFICATES, SERIES 2006-AC5,

                    Plaintiff,

        vs.

NV EAGLES, LLC et al.,

                    Defendants.

2:15-cv-00786-RCJ-PAL

**ORDER**

        This case arises from the foreclosure and subsequent sale of a residential property for the owner's failure to pay dues owed to Defendant Sandstone Condominiums Homeowners Association ("the HOA"). Pending before the Court is US Bank's Motion to Dismiss, (ECF No. 35), the counterclaim for declaratory judgment brought by Defendants Underwood Partners, LLC and NV Eagles, LLC. Also pending is US Banks' Motion to Amend its Complaint. (ECF No. 45). For the reasons contained herein, the Motion to Dismiss is granted and the Motion to Amend is denied as moot.

## I.     FACTS AND PROCEDURAL HISTORY

        On June 27, 2006, Michael Cress purchased a home located at 517 W. Mesquite Boulevard #1524, Mesquite, Nevada 89027 ("the Property"). (Compl. ¶¶ 2, 12, ECF No. 1). The

Deed of Trust executed identified GreenPoint Mortgage Funding, Inc. as the lender, MERS as the beneficiary, Marin Conveyance Corp. as the trustee, and a secured amount of $148,000. (*Id.* ¶ 13).  The Property is located in a planned community and is subject to certain covenants, conditions, and restrictions ("CC&Rs").  On April 13, 2012, a Notice of Delinquent Assessment Lien was recorded by the HOA's for Cress's failure to pay dues owed. (*Id.* ¶ 14).  On May 31, 2012, the HOA recorded a Notice of Default and Election to Sell under Homeowners Association Lien against the Property pursuant to N.R.S. 116.3116 *et seq*. (*Id.* ¶ 15).

In July 2012, Bank of America, the prior beneficiary and servicer of the loan, requested a current HOA lien payoff demand and account ledger from the HOA's agent that was facilitating the sale, Nevada Association Services, Inc. ("NAS"). (*Id.* ¶ 16).  Bank of America was informed by NAS that NAS was not willing to provide a current payoff ledger due to a concern of violating the Fair Debt Collection Practices Act. (*Id.* ¶ 17).  However, based on information about the assessments charged on similar properties within the HOA, Bank of America estimated the HOA's lien plus reasonable collection costs to be somewhere around $2,036.33. (*Id.* ¶ 18). Bank of America therefore tendered this amount to NAS in an attempt to satisfy the HOA's lien and protect its interest in the Property. (*Id.* ¶ 19).  On August 10, 2012, NAS informed Bank of America that the payoff had been rejected. (*Id.* ¶ 20).  At some point, Plaintiff became the assigned beneficiary under the promissory note and deed of trust. (*Id.* ¶ 6).

On January 22, 2013, a Notice of Foreclosure Sale was recorded against the Property by NAS at the HOA's direction. (*Id.* ¶ 21).  Defendants allege that Plaintiff had constructive notice of the foreclosure proceedings through the recording and publication of the notice of sale. (Countercl. ¶¶ 8, ECF No. 20).  The Property was acquired by Defendant Underwood on April 19, 2013 by submitting the winning bid of $9,000 for the Property at the foreclosure auction. (*Id.*

¶ 3). On May 21, 2013, a Foreclosure Deed was recorded with Underwood named as the grantee. (*Id.* ¶ 4). Underwood then sold the Property to Defendant NV Eagles, and a Grant Bargain and Sale Deed was recorded on October 18, 2013. (*Id.* ¶ 5).

US Bank filed this lawsuit against Defendants on April 28, 2015 ultimately seeking to quiet title to the Property. Defendants Underwood and NV Eagles (collectively, "Defendants") filed a counterclaim seeking declaratory relief that the foreclosure proceedings were valid and that NV Eagles properly holds title to the Property. (Countercl. ¶¶ 20–23, ECF No. 20). Defendants' counterclaim, at least in part, is based upon the Nevada Supreme Court's decision in *SFR Investments Pool 1 v. U.S. Bank*, 334 P.3d 408, 409 (Nev. 2014), in which the court held that homeowners associations hold true super-priority liens that can extinguish first deed of trust through non-judicial foreclosures.

On May 27, 2015, NAS and the HOA filed a motion to dismiss for US Banks's failure to mediate its claims before pursing the instant action. The Court determined that mediation was unnecessary and denied the motion. (ECF No. 48). The parties have also stipulated to dismiss NAS as a Defendant in this case. (ECF No. 49). US Bank now moves to dismiss Defendants' counterclaim for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). US Bank has also filed a Motion seeking to amend its pleading along with a proposed first amended complaint.

## II.   MOTION TO DISMISS

### A. Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer

evidence to support the claims. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quotations omitted).  "A complaint may be dismissed as a matter of law for one of two reasons: '(1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal claim.'" *Allen v. United States*, 964 F. Supp. 2d 1239, 1251 (D. Nev. 2013) (quoting *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984)).  Allegations in the complaint are taken as true and construed in the light most favorable to the plaintiff. *Id.* (citation omitted).

To avoid a Rule 12(b)(6) dismissal, a complaint does not need detailed factual allegations, but it must plead "enough facts to state a claim to relief that is plausible on its face." *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

**B. Discussion**

US Bank raises five theories in support of its Motion.  First, it argues that the statutory scheme under N.R.S. Chapter 116 ("the Statute") is unconstitutional because it fails to require that foreclosing HOAs send notice to junior lien holders in violation of due process.  Second, it contends that the extinguishment of its lien pursuant to the Statute amounts to a regulatory taking.  Third, US Bank argues that the court's interpretation of the Statute in *SFR Investments* is contrary to public policy.  Fourth, it argues that the foreclosure sale in this case was commercially unreasonable and is therefore void.  And fifth, US Bank contends that the holding in *SFR Investments* should be applied only prospectively and not retroactively.

///

### 1. Public Policy

A federal court must honor state law in diversity cases, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), as authoritatively interpreted by the state's own courts, *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967) (citing *id.*).  A federal court may not under *Erie* countermand a state court's authoritative interpretation of a state statute based upon the federal court's own sense of public policy under state law.  A state's own public policy is inherent in its statutes and the authoritative judicial opinions interpreting them.  A pronouncement by a federal court that a state's own public policy requires a different interpretation or application of a statute than the state's highest court has given it would run afoul of *Erie*, because a state's highest court presumably considers public policy when it interprets state statutes and implicitly rejects any public policy arguments against the interpretation it adopts.  Only if a state supreme court were to announce a public policy in a later case after having previously interpreted a statute would it arguably be appropriate for a federal court sitting in diversity to anticipate that the state supreme court would alter its previous interpretation of the statute based on its later pronouncement of the state's public policy.  US Bank does not allege such a pattern of events.

On the other hand, a federal court may strike down a state statute under the "substantive due process" component of the Due Process Clause of the Fourteenth Amendment where a law deprives a person of a right to life, liberty, or property that a court in its "reasoned judgment" believes is "fundamental," even if the proffered right is not specifically listed in the Constitution, so long as the right can be perceived from history, tradition, or "new insight." *Obergefell v. Hodges*, --- S. Ct. ----, 2015 WL 2473451, at *11, 20 (2015) (liberty interest) ("[T]he Constitution contemplates that democracy is the appropriate process for change, so long as that process does not abridge fundamental rights.  [But], when the rights of persons are violated, the

Constitution requires redress by the courts, notwithstanding the more general value of democratic decisionmaking." (citations and internal quotation marks omitted)); *accord Lochner v. New York*, 198 U.S. 45, 56–57 (1905) (liberty and property interests) ("This is not a question of substituting the judgment of the court for that of the legislature. . . . It is a question of which of two powers or rights shall prevail, the power of the state to legislate or the right of the individual to liberty of person and freedom of contract.").  A court should only exercise its reasoned judgment to invalidate a democratically enacted law in the absence of any clear constitutional requirement to do so after there has been "a quite extensive discussion" concerning the right at issue in the halls of government and amongst the general public. *Obergefell*, 2015 WL 2473451, at *9.

The doctrine of substantive due process is the closest thing of which the Court is aware to a federal judicial power to strike down a state law based on a federal court's own notions of good policy.  US Bank has not made a substantive due process argument, but *Obergefell* was decided after the present motion was filed, and the theory of substantive due process reinvigorated therein had been long discredited before that opinion was announced.  Normally, the Court would permit US Bank to make such an argument in a subsequent motion to dismiss if it wished to do so, because the defense was not available when US Bank filed the present motion, *see* Fed. R. Civ. P. 12(g)(2), but the issue is moot because the Court dismisses the Counterclaim for another reason, *see infra*.  Still, the Court will permit US Bank to amend the Complaint to plead a substantive due process theory if it wishes.

**2. Prospective Application of the Statute**

US Bank argues that *SFR Investments*' interpretation of the Statute should not apply retroactively, i.e., that it should only apply to HOA foreclosure sales occurring after the date *SFR*

*Investments* was decided.  The Court is compelled to reject the argument under *Erie*.  The *SFR Investments* Court itself applied the Statute retroactively in the way US Bank argues against.  The HOA foreclosure sale had already occurred in that case as well, and the Nevada Supreme Court gave no indication that its ruling was not to apply in the case before it but only to future HOA foreclosure sales.

### 3. The Takings Clause

Both the United States and Nevada Constitutions prohibit the taking of private property by a governmental entity for public use without just compensation. *See* U.S. Const. amend V, Nev. Const. art. I, § 8, cl. 6.  When the government destroys a lien under state law and itself receives the value of the destroyed lien, there is a Fifth Amendment taking, even if the lien remains technically valid but unenforceable because of the United States' sovereign immunity:

> The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment "taking" and is not a mere "consequential incidence" of a valid regulatory measure.  Before the liens were destroyed, the lienholders admittedly had compensable property.  Immediately afterwards, they had none. This was not because their property vanished into thin air.  It was because the Government for its own advantage destroyed the value of the liens, something that the Government could do because its property was not subject to suit, but which no private purchaser could have done.  Since this acquisition was for a public use, however accomplished, whether with an intent and purpose of extinguishing the liens or not, the Government's action did destroy them and in the circumstances of this case did thereby take the property value of those liens within the meaning of the Fifth Amendment.

*Armstrong v. United States*, 364 U.S. 40, 46–49 (1960) (holding that the inability of a subcontractor to enforce an otherwise valid materialmen's lien under state law against the United States after the United States acquired title to certain boats from the general contractor under a contractual default clause resulted in a compensable taking).  Here, the value transferred from US Bank to Defendants via the destruction of US Bank's lien was not for any public use, but the

7

Supreme Court has also noted that the transfer of the value of a lien from a private creditor to a private debtor might be a Fifth Amendment taking, because the Fifth Amendment prohibits the government from taking private property for a non-public use regardless of whether it pays just compensation and regardless of whether it immediately transfers the value of the thing taken to a third party. *See United States v. Sec. Indus. Bank*, 495 U.S. 70, 76–78 (1982).

Ultimately, however, the Court interpreted the bankruptcy provision at issue to operate only prospectively in order to avoid the potential constitutional problem, so the discussion on the Takings Clause in that case would appear to be dicta. *See id.* at 78–82.  US Bank is correct that the Supreme Court has directly ruled that a federal statute may not take the interest of a mortgagee and give it to a mortgagor without effecting a taking. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601–02 (1935) (holding that a federal law permitting a farm mortgagor to force a sale to himself from the mortgagee at the current assessed value unlawfully took the property of the mortgagee).  But that isn't what US Bank alleges happened here.  Here, a junior lienor has lost its interest via a senior lienor's foreclosure sale at a price leaving little or nothing for the junior lienor.  There may or may not be legitimate issues of due process or commercial reasonableness, but the loss of a junior lienor's interest via the sale of an undersecured property is a common result.

The Court is compelled to reject the takings argument in this case.  The destruction of an undersecured junior lien via the foreclosure of a senior lien under priority rules published before the junior lienor took his lien has never been held to implicate the Takings Clause to this Court's knowledge.  The Court has searched for such a case to no avail, and US Bank has cited to none. The announcement by the Nevada Supreme Court of its interpretation of the Statute's priority rules that were at best previously unclear and at worst previously to the contrary raises colorable

arguments under the Contract Clause, the Ex Post Facto Clause, the substantive due process component of the Due Process Clause, and perhaps the "synergy" between the rights against retroactive lawmaking and the fundamental right to property emanating from those clauses. *Cf. Obergefell*, 2015 WL 2473451, at *17.  That is, the federal fundamental rights against a state's use of retroactive laws and the deprivation of property without due process may indeed protect a lienholder from the application of a state judicial opinion applying lien priority rules in a way that a reasonable lienholder would not have anticipated under the state of the law when he gave his lien.  US Bank may amend the Complaint to plead those issues if it wishes, but the Court perceives no takings problem.

### 4. Commercial Unreasonableness of the Sale

> In addition to giving reasonable notice, a secured party must, after default, proceed in a commercially reasonable manner to dispose of collateral.  Every aspect of the disposition, including the method, manner, time, place, and terms, must be commercially reasonable.  Although the price obtained at the sale is not the sole determinative factor, nevertheless, it is one of the relevant factors in determining whether the sale was commercially reasonable.  A wide discrepancy between the sale price and the value of the collateral compels close scrutiny into the commercial reasonableness of the sale.

*Levers v. Rio King Land & Inv. Co.*, 560 P.2d 917, 919–20 (Nev. 1977) (citations omitted).

Under the facts of the case as pled, it is clear that US Bank would survive a motion to dismiss on its own claim for a declaratory judgment that the sale in this case was commercially unreasonable.  But US Bank is not entitled to dismissal of Defendants' counterclaim for a declaration that it was not.  Whether the sale here was commercially reasonable is a factual matter for summary judgment or trial.  The Court will not rule purely on the (albeit undisputed) "wide discrepancy between the sale price and the value of the collateral" because the Court (or a jury) must consider any competent evidence proffered as to the other factors.  There could be some factual circumstance accounting for the extremely low sale price that alleviates the

1   concerns of commercial unreasonableness created thereby.  There is currently no evidence before

2   the Court under which the Court could transform the present motion into one for summary

3   judgment.

4       **5. Notice Under the Due Process Clause**

5           US Bank argues that because the statutes do not require junior lienors to be given notice

6   of an impending HOA foreclosure sale that might extinguish their junior liens, junior lienors in

7   such circumstances are deprived of the fundamental right to notice protected by the Due Process

8   Clauses of the Constitution.  The Court finds that the Statute does not provide sufficient process

9   and grants the motion based on the Due Process Clause of the Fifth Amendment.

10          As an initial matter, the Court notes that, despite Defendants' arguments to the contrary,

11  US Bank has standing to bring its constitutional challenge.  Defendants contend that not only

12  does the Statute require that notice be sent to holders of recorded security interests such as US

13  Bank, but they also argue that Defendant received actual notice of the foreclosure sale and thus

14  cannot claim any injury.  The Court disagrees with both arguments.  As discussed below, the

15  current statutory scheme does not mandate that notice be sent to holders of a recorded security

16  interest and instead requires that such secured parties request or "opt-in" to receive notice.

17  Furthermore, Defendants do not allege in their counterclaim that notice of the foreclosure sale

18  was mailed or otherwise delivered directly to US Bank, but only that the HOA "record[ed],

19  post[ed] and publi[shed]" the notice of sale. (Countercl. ¶ 8).  It is the adequacy of these methods

20  of notice that is the basis for US Bank's facial challenge to the Statute, not whether publication

21  of the notice was made.  There are no allegations in the counterclaim, even upon information and

22  belief, that US Bank had actual knowledge of the sale.  And US Bank can certainly claim that it

23

24

was injured by the extinguishment of it its secured interest.  The Court is therefore satisfied that US Bank has standing to bring its facial challenge for violation of due process.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  The *Mullane* Court ruled that under this standard notice by publication of an action to settle the accounts of a common trust fund was constitutionally insufficient to inform those beneficiaries whose names and addresses were known. *Id.* at 315; *see also, e.g.*, *Walker v. City of Hutchinson*, 352 U.S. 112 (1956) (ruling that publication was insufficient under the Due Process Clause to provide reasonable notice of condemnation proceedings to a landowner whose name was known); *Schroder v. City of N.Y.*, 371 U.S. 208 (1962) (same).  Likewise, a governmental body conducting a tax sale must provide notice to junior lienors under the standards of *Mullane*. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983).  An HOA foreclosure sale under section 116.3116 can be seen as analogous to the tax sale in *Mennonite Board of Missions* by simply inserting "HOA" for "tax" in the relevant passage:

> [A] mortgagee possesses a substantial property interest that is significantly affected by a[n HOA] sale.  Under [Nevada] law, a mortgagee acquires a lien on the owner's property . . . .  A mortgagee's security interest generally has priority over subsequent claims or liens attaching to the property, and a purchase money mortgage takes precedence over virtually all other claims or liens including those which antedate the execution of the mortgage.  The [HOA] sale immediately and drastically diminishes the value of this security interest by granting the [HOA]-sale purchaser a lien with priority over that of all other creditors.  Ultimately, the [HOA] sale may result in the complete nullification of the mortgagee's interest, since the purchaser acquires title free of all liens and other encumbrances . . . .
>
>      . . . .

Neither notice by publication and posting, nor mailed notice to the property owner, are means "such as one desirous of actually informing the [mortgagee] might reasonably adopt to accomplish it." Because they are designed primarily to attract prospective purchasers to the tax sale, publication and posting are unlikely to reach those who, although they have an interest in the property, do not make special efforts to keep abreast of such notices. Notice to the property owner, who is not in privity with his creditor and who has failed to take steps necessary to preserve his own property interest, also cannot be expected to lead to actual notice to the mortgagee. The County's use of these less reliable forms of notice is not reasonable where, as here, "an inexpensive and efficient mechanism such as mail service is available."

Personal service or mailed notice is required even though sophisticated creditors have means at their disposal to discover whether [HOA dues] have not been paid and whether [HOA] sale proceedings are therefore likely to be initiated. In the first place, a mortgage need not involve a complex commercial transaction among knowledgeable parties, and it may well be the least sophisticated creditor whose security interest is threatened by a tax sale. More importantly, a party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation.

*Id.* at 798–99 (citations omitted). *Mennonite Board of Missions* makes clear that junior lienors must be given notice via personal service or mail (or perhaps via some other constitutionally reasonable method) where they stand to lose a security interest in a property via a tax sale, and that publication is not normally constitutionally sufficient.

There is, of course, a critical distinction between *Mennonite Board of Missions* and the present case. Notice under the Due Process Clause is only a requirement as to government action, because the Fourteenth Amendments does not govern private action. *Civil Rights Cases*, 109 U.S. 3, 10–11 (1883). A government conducting a tax sale to execute upon its own lien is clearly subject to *Mullane*, but a homeowner's association is not necessarily an arm of the government simply because it conducts a non-judicial sale under state law. When a state permits a private actor to use the machinery of government to deprive another private actor of his constitutional rights, the first actor may in some cases be treated as a state actor for the purposes of the Fourteenth Amendment. In *Shelley v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court

ruled that the judicial enforcement of a racially restrictive covenant by a homeowner's association constituted state action.

The Court first noted that the Equal Protection Clause of the Fourteenth Amendment spoke to the constitutional issue of race discrimination. *See id.* at 10.  Similarly here, the Due Process Clause of the Fifth Amendment speaks to the constitutional issue of notice.  Second, the Court noted that the private rule at issue would be unconstitutional under its precedents if a government actor were to enforce an identical rule. *See id.* at 11.  Likewise here. *See Mennonite Bd. of Missions*, 462 U.S. at 798–99.  Third, the Court noted that in the case before it, as here, the rule had not been imposed by a state or municipal legislature, but by a private homeowner's association. *See Shelley*, 334 U.S. at 12–13.  The Court ruled that "the restrictive agreements standing alone cannot be regarded as a violation of any rights guaranteed . . . by the Fourteenth Amendment. . . . But here there was more." *Id.* at 13.  That "something more" was the judicial enforcement of the restrictions. *See id.* at 13–14.  The same is true here as to Defendants' counterclaim; although Defendants do not seek judicial foreclosure, they do ask the Court to declare the validity of the non-judicial foreclosure under state law, including the statutory notice procedures.  A plain reading of *Shelley* would therefore lead the Court to apply it against the counterclaim in this case, although the Due Process Clause of the Fifth Amendment would apply, as opposed to the Due Process Clause of the Fourteenth Amendment, because Defendants ask a federal court to enforce the challenged laws, so it is the present federal judicial action that is the source of the government action under the theory of *Shelley*, not the non-judicial foreclosure under state law itself.

The Court of Appeals has ruled that a state's creation of non-judicial foreclosure statutes alone does not sufficiently involve a state in a non-judicial foreclosure to implicate state action

unless some state actor such as a sheriff or court clerk has some direct involvement in the sale, which is not alleged here. *See Apao v. Bank of N.Y.*, 324 F.3d 1091, 1093–94 (9th Cir. 2003); *Charmicor v. Deanor*, 572 F.2d 694, 695–96 (9th Cir. 1978).  But the present situation is distinguishable from *Apao* in a way that is essential to the rule of *Shelley*.

In *Apao*, the mortgagor herself had brought the action against the foreclosing mortgagee after the foreclosure sale. *See Apao*, 324 F.3d at 1092.  There, neither the mortgagee nor any other party sought a judicial declaration of the validity of the foreclosure sale as against the mortgagor, so no party had invoked the power of the United States (or any state) to enforce the relevant statutes against the mortgagor.  To the contrary, it was the complaining mortgagor who had attempted to invoke the judicial power of the United States to void the sale. *See id.*  There was therefore no *Shelley* problem in *Apao* because the district court was not being asked to enforce a constitutionally problematic statute via judicial foreclosure or to declare the validity of a non-judicial foreclosure, but rather to void a completed non-judicial foreclosure.

The same is true of US Bank's quiet title claim here.  Although US Bank is a junior lienor and not a mortgagor, it is similarly situated to the mortgagor in *Apao* for the purposes of the rule of *Shelley*.  As in *Apao*, US Bank's own quiet title claim cannot implicate state action under the rule of *Shelley*, because it is US Bank itself, not Defendants, who asks the Court to adjudicate the validity of the potentially constitutionally problematic statutes.  For reasons of standing, ripeness, estoppel, waiver, equity, and probably several other jurisprudential doctrines, US Bank cannot complain of the threat of impending judicial action that it has itself demanded. It therefore cannot invoke the rule of *Shelley* to turn this Court's impending ruling on its own claim into government action against it.  If this were not the case, the rule of *Shelley* could be combined with a declaratory judgment action by any plaintiff to avoid the state-action

14

1   requirement under the Fifth or Fourteenth Amendments.  That is, a plaintiff could convert any

2   private action into state action simply by asking a court to declare that the private action would

3   be unconstitutional if it had been state action.  The rule of *Shelley* does not reach so far.  US

4   Bank's only purchase onto due process standards in the context of its own claims is an argument

5   that the State of Nevada violated the Fourteenth Amendment via its direct involvement in the

6   foreclosure sale, *see Apao*, 324 F.3d 1091 at 1093–94, which is not alleged.

7        The result is different with respect to Defendants' counterclaim, however.  In the context

8   of Defendants' counterclaim, US Bank may under the rule of *Shelley* invoke the Fifth

9   Amendment against this Court's potential declaration that NV Eagles owns the Property free and

10  clear of US Bank's interest based on the HOA and NAS's compliance with certain state statutes

11  governing the notice process if those statutes do not comport with due process.  As to the

12  counterclaim, Defendants have invoked the power of the Court to enforce potentially

13  constitutionally problematic state statutes against US Bank just as the neighboring homeowners

14  in *Shelley* sought to invoke the power of the state courts to enforce the constitutionally

15  problematic covenants against the Shelleys. *See Shelley*, 334 U.S. at 6.  Because this Court's

16  enforcement of the state statutes via a declaration in accordance with the counterclaim would

17  constitute government action under the Fifth Amendment, *see id.* at 14–15 & n.14 (collecting

18  cases), the Court must address the underlying due process issue in determining the motion to

19  dismiss the counterclaim, regardless of whether the non-judicial foreclosure action itself

20  constituted state action under the Fourteenth Amendment.

21        With respect to notifying US Bank of the sale, Defendants allege that the HOA only

22  complied with the statutes, not that it went beyond them. (*See* Countercl. ¶ 8 ("As recited in the

23  Foreclosure Deed, the Association foreclosure sale complied with all requirements of law,

24

1    including but not limited to, recording and mailing of copies of Notice of Delinquent

2    Assessments and Notice of Default, and the recording, posting and publication of the Notice of

3    Sale as required by Nevada Law.")).  Nevada's statutes governing which parties must receive

4    notices of default and notices of sale in HOA foreclosures are complex.

5        First, section 116.31162 governs notice of delinquent assessments and notice of default

6    ("NOD") to unit owners. *See* Nev. Rev. Stat. § 116.31162.  That statute is not implicated here.

7    Second, section 116.31163 requires notice of a NOD by first class mail within 10 days of

8    recordation of the NOD to: (1) those who have requested notice under sections 116.31168 or

9    107.090; (2) any holder of a recorded security interest who has notified the foreclosing HOA 30

10   days prior to the recordation of the NOD of the existence of its security interest; and (3) certain

11   purchasers of the unit. *See id.* § 116.31163.  As to junior lienors of record like US Bank, section

12   116.31163 therefore operates as an opt-in system requiring affirmative action by the junior lienor

13   of record to obtain notice of a NOD with respect to an HOA sale.

14       Third, section 116.311635 requires a notice of sale ("NOS") by certified or registered

15   mail, return receipt requested, to: (1) the owner; (2) those entitled to notice of the NOD under

16   section 116.31163, i.e., those who have opted in under that section; (3) certain purchasers and

17   any holder of a recorded security interest who has notified the foreclosing HOA of the existence

18   of its security interest prior to the mailing of the NOS; and (4) the Ombudsman for Owners in

19   Common-Interest Communities and Condominium Hotels. *See id.* § 116.311635.  As to junior

20   lienors of record like US Bank, section 116.311635 therefore also operates as an opt-in system

21   requiring affirmative action by the junior lienor of record to obtain notice of a NOS with respect

22   to an HOA sale.

23       Fourth, section 116.31168 states, "[t]he provisions of NRS 107.090 apply to the

24

16

1    foreclosure of an association's lien as if a deed of trust were being foreclosed.  The request must

2    identify the lien by stating the names of the unit's owner and the common-interest community."

3    *Id.* § 116.31168.  Section 107.090 defines a "person with an interest" as including lienors of

4    record, *see id.* § 107.090(1), notes that such persons may request copies of a NOD and NOS by

5    recording such a request, *see id.* § 107.090(2), and requires notice by certified or registered mail,

6    return receipt requested of both the NOD and NOS to anyone who has requested such notice

7    under section 107.090(2) *and any junior lienor of record*, *see id.* § 107.090(3)–(4).

8          Section 116.31168's incorporation of section 107.090 would therefore appear to prevent

9    a facial due process attack on the notice procedures governing HOA sales in Nevada, despite the

10   opt-in provisions of sections 116.31163 and 116.311635.[1]  Though, US Bank could still rely on

11   its allegations that it did not in fact receive constitutionally sufficient notice in this case even if

12   the statutes required it.  But the Court finds that the statutes did not in fact require mailed notice

13   to US Bank of the NOD or the NOS.

14         There is an ambiguity in section 116.31168 that the Nevada Legislature has recently

15   clarified by amending the statute.  Section 116.31168's first sentence read alone appears to

16   incorporate section 107.090 en toto. *See id.* § 116.31168(1) ("The provisions of NRS 107.090

17   apply to the foreclosure of an association's lien as if a deed of trust were being foreclosed.").

18   But its second sentence makes it appear as if the Nevada Legislature may have intended to

19   incorporate only the request-notice provision under section 107.090(2). *See id.* ("*The request*

20   must identify the lien by stating the names of the unit's owner and the common-interest

21   community." (emphasis added)).  A recent amendment to section 116.31168 completely amends

22

23   _____

[1] Those opt-in provisions are not rendered superfluous by section 116.31168's incorporation of section 107.090, because they permit opt-in notice for a broader category of lienors than the category of lienors to whom section 107.090 requires automatic notice.  Section 107.090 requires notice only for junior lienors of record, but sections 116.31163 and 116.311635 permit opt-in notice for any lienor of record.

24

1   that section, removing any mention of section 107.090 and making clear that the opt-in

2   procedure applies to both NODs and NOSs. *See* S.B. 306 § 7 (2015).

3          Contemporaneous amendments to sections 116.31163 and 116.311635 applicable to

4   foreclosures where the NOD or NOS are recorded on or after October 1, 2015, respectively,

5   requires mailing a copy (by certified mail) of both the NOD and the NOS to all lienors of record

6   whose liens were recorded prior to the recordation of the NOD or the mailing of the notice of

7   sale, respectively. *See id.* §§ 3–4, 9(1) (2015).  These latter amendments probably avoid any

8   facial due process notice issues going forward, but the very need for these amendments indicates

9   that the statutes previously did not require such notice, i.e., that section 116.31168 did not

10  incorporate section 107.090 en toto.

11         The Nevada Supreme Court itself has noted that the Nevada Legislature declined to adopt

12  the Uniform Common Interest Ownership Act's ("UCIOA")  recommendation of "reasonable

13  notice . . . to all lien holders of the unit whose interest would be affected," *see* UCIOA 3-

14  116(j)(4), in favor of its own particularized notice provisions under Chapter 116. *See SFR Invs.*

15  *Pool 1*, 334 P.3d at 411.  Critically, although the Nevada Supreme Court noted that section

16  107.090 is incorporated by section 116.31168(1), in the very same paragraph, and even when

17  specifically citing to subsections 107.090(3)(b) and (4) (the provisions requiring mailed notice of

18  NODs and NOSs to junior lienors of record in deed of trust foreclosures), the Court very clearly

19  stated that notice to a lienor of record requires the lienor to have notified the HOA of the interest

20  before the recordation of the NOD or mailing of the NOS under sections 116.31163 and

21  116.311635, respectively. *See id.*  This shows that the Nevada Supreme Court reads section

22  116.31168 either not to incorporate the automatic notice provisions of section 107.090(3)–(4), or

23  that the opt-in provisions of 116.31163 and 116.311635 somehow supersede them.

24

The question now is whether notice only by publication of the time and place of sale is constitutionally reasonable.  The Court is compelled to find that it is not.  "Notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to *a proceeding which will adversely affect the liberty or property interests* of *any* party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable." *Mennonite Board of Missions*, 462 U.S. at 800 (first emphasis added).  US Bank's security interest in the Property was not adversely affected by the declaration of default or election to sell the Property but by the sale itself.  That is the event that foreclosed the right of redemption and vested title in Underwood, and eventually NV Eagles, free of US Bank's lien, *see* Nev. Rev. Stat. § 116.31166(3), and that is therefore the event of which US Bank was constitutionally entitled to reasonable notice, *see Mullane*, 339 U.S. at 314 ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").  Notice is constitutionally reasonable when it is attempted in a manner such as a person who actually wants the recipient to receive notice might attempt it:

> [W]hen notice is a person's due, process which is a mere gesture is not due process.  The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.  The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . ., or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.

*Id.* at 315 (citations omitted).

Where US Bank's identity and address were readily obtainable—an issue that is not genuinely disputed—publication alone of the NOS was not a means such as one actually desirous

19

of informing US Bank of the sale might reasonably have adopted.  It is not constitutionally

reasonable to require an interested party to monitor the public records for a NOS or to opt-in for

notice of it.  The constitutional standard is whether the person giving the notification made

reasonable efforts to apprise the interested party of the proceeding under all the circumstances as

if he actually wanted to notify him.  That standard is not satisfied by the Statute.  A person

actually desirous of informing an interested party of a foreclosure sale would not rely on

publication alone where the interested party's address is readily obtainable or even obtainable

with some fair amount of effort.  The duty cannot be shifted to an interested party to actively

request notice of a potential event beforehand where the event is of a type that the interested

party would obviously want notice.  A person actually desirous of informing another person of

an impending foreclosure sale would not gamble with mere publication or provide notice only if

requested beforehand.  Merely recording a notice of sale in the public records and posting it near

the courthouse steps where active effort is required to discover it rather than mailing the

interested party a copy of the notice at his easily obtainable address is not constitutionally

reasonable.

In summary, the relevant statutes as they stood at the relevant times did not satisfy due

process where the sale can be characterized as government action.  Defendants' counterclaim for

a declaration by this Court of the extinguishment of US Bank's interest via the HOA foreclosure

sale implicates government action under the rule of *Shelley* and the Due Process Clause of the

Fifth Amendment.  The Court therefore dismisses Defendants' counterclaim without prejudice.

Defendants may amend to allege that US Bank was mailed a copy of the NOS or that US Bank

had actual knowledge of the NOS.[2]  As the Court has explained, *supra*, US Bank's own quiet

---

[2] If Defendants amend their counterclaim to allege that US Bank had actual knowledge of the foreclosure sale, the Court expects the pleading to include some factual assertion that would allow a reasonable inference thereof.

title claim cannot succeed on the due process issue without a showing of state action in the non-judicial foreclosure sale itself, but that issue is not now before the Court.

## III.     MOTION TO AMEND

US Bank has filed a Motion to Amend its Complaint for purposes of surviving the HOA's challenge that mediation was required before the claims could be brought in court. (*See* Mot. to Amend 2, ECF No. 45). It appears as though the only purpose for the Motion was to overcome the arguments raised by NAS and the HOA in their previously filed motion to dismiss. (*See id.* at 3 (discussing N.R.S. § 38.310, the statute that requires mediation of certain claims by homeowners when those claims arise under HOA CC&Rs)). However, as the Court ruled in its order denying NAS and the HOA's motion, N.R.S. § 38.310 does not generally apply to beneficiaries of deeds of trust that are seeking to quiet title to a subject property. (*See* July 21, 2014 Order, ECF No. 48). Since the motion was denied and the original version of the Complaint upheld, there appears to be no reason for the amendment. If US Bank disagrees, the Court invites it to refile the Motion.

## CONCLUSION

IT IS HEREBY ORDERED that US Bank's Motion to Dismiss (ECF No. 35) is GRANTED without prejudice.

IT IS FURTHER ORDERED that US Bank's Motion to Amend (ECF No. 45) is DENIED as moot without prejudice.

IT IS SO ORDERED.

Dated: __ September 3, 2015 ____

_____
ROBERT C. JONES
United States District Judge

21